IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

vs.                                             3:00CR48/LAC
                                                3:05CV117/LAC/MD

JEFFREY A. MATZ

---

### REPORT AND RECOMMENDATION

This matter is before the court upon a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. §2255, addendum, affidavit, and "points and authorities." (doc. 1237, 1238, 1263 & 1264). The government has filed a response (doc. 1296) and the defendant has filed a reply (doc. 1299). The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). After a careful review of the record and the arguments presented, it is the opinion of the undersigned that defendant has not raised any issue requiring an evidentiary hearing, Rules Governing Section 2255 Cases 8(a) and (b), and that the motion should be denied.

## I.  BACKGROUND

Defendant Jeffrey A. Matz, an attorney formerly licensed in the state of California, was charged in two counts of a third superseding indictment with conspiracy to commit wire fraud or securities fraud and conspiracy to engage in or attempt to engage in a monetary transaction of criminally derived property of a value greater than $10,000. (Doc. 388). The

alleged fraud took place as part of a complex "Ponzi" scheme[1] wherein wealthy individuals were induced to invest large sums of money in exchange for unusually high rates of return. Defendant Matz was represented at trial by appointed counsel Steven Quinnell, Esq. who took over when previously appointed counsel, Reed Ammon, Esq. was unable to continue due to illness.

Following a six week jury trial involving eight of the ten charged defendants, defendant Matz was convicted on both counts. (Doc. 490). He filed two unsuccessful motions for a new trial and for judgment of acquittal, (doc. 509 & 527; 509 & 527), and an unsuccessful motion for release pending sentencing. (Doc. 473, 482, 496, & 497). Counsel moved to withdraw, the motion was granted after a hearing and the defendant was allowed to proceed pro se at sentencing. (Doc. 555, 577, 578 & 580). Defendant then filed an unsuccessful motion for a mistrial (doc. 611 & 636). He was sentenced to a term of 60 months imprisonment on count one and a 97 month concurrent term on count two, three years of supervised release and restitution in the amount of $9,334,885.42. (Doc. 650 & 668).

After sentencing, defendant filed a motion for appointment of a particular attorney as counsel on appeal, or in the alternative to be allowed to proceed pro se. (Doc. 646). The district court allowed him to proceed pro se. (Doc. 661). Before the appeal was concluded, defendant also filed a motion for release from custody pending appeal, which was denied (doc. 854 & 902), and another unsuccessful motion for a new trial (doc. 1108 & 1109), and he was found to be in criminal contempt of court for his failure to cooperate in turning over assets required to be forfeited. (Doc. 914).

---

[1]Ponzi schemes are a type of illegal pyramid scheme named for Charles Ponzi, who duped thousands of New England residents into investing in a postage stamp speculation scheme back in the 1920s. Ponzi thought he could take advantage of differences between U.S. and foreign currencies used to buy and sell international mail coupons. Ponzi told investors that he could provide a 40% return in just 90 days compared with 5% for bank savings accounts. Ponzi was deluged with funds from investors, taking in $1 million during one three-hour period. Though a few early investors were paid off to make the scheme look legitimate, an investigation found that Ponzi had only purchased about $30 worth of the international mail coupons. Decades later, the Ponzi scheme continues to work on the "rob-Peter-to-pay-Paul" principle, as money from new investors is used to pay off earlier investors until the whole scheme collapses. http://www.sec.gov/answers/ponzi.htm

The Eleventh Circuit Court of Appeals granted defendant's request for appointment of counsel. (Doc. 944). In his appeal, defendant raised 22 issues.[2] His conviction and sentence were affirmed on February 27, 2004. (Doc. 1184).

In the present motion, defendant raises two grounds for relief. He contends that his sentence violated his constitutional rights under *United States v. Booker*, and, in a claim involving nineteen subparts labeled "B through T," contends that counsel was constitutionally ineffective. He has left virtually no stone unturned in his challenge

_____

[2]The issues identified by the appellate court in its opinion were as follows:

1. The defendant's motion to suppress should have been granted because the terms of the warrant's limiting order were violated thereby transforming the search into a general search.

2. The defendant did not receive a fair trial when the government promised not to enter any of the items seized from the second search into evidence and the defendant waived his right to challenge the search based on that promise.

3. The trial court should have granted the defendant's motion to proceed pro se or it should have granted the motion to continue so that the defendant's attorney could be prepared for trial.

4. The motion to dismiss the indictment should have been granted because the defendant was given immunity.

5. The defendant's convictions should be overturned due to the government's *Brady* violations.

6. The defendant's motion to be relieved from prejudicial joinder should have been granted.

7. The money laundering count of the indictment is defective for failing to "specify the unlawful activity" from which the laundered funds were derived.

8. The securities statute is void for vagueness because its definition of "security" is so broad it renders the definition unintelligible and results in arbitrary enforcement.

9. The government failed to prove a violation of the securities statute where it did not prove that the defendant's conduct was not covered by any of the statutory exemptions.

10. The current standard of review of a motion for judgment of acquittal in a circumstantial evidence case is unconstitutional.

11. There was insufficient evidence to prove that the defendant conspired to commit money laundering and conspired to commit wire and securities fraud.

12. The "Leland Letter" and the defendant's pre-Hammersmith bank records should not have been allowed into evidence.

13. The trial court erred by failing to instruct the jury on the lesser included offense of misprision of felony.

14. The defendant received ineffective assistance of trial counsel.

15. The district court abused its discretion when it did not continue the sentencing.

16. The extraordinary (sic) large amount of restitution imposed on the defendant is not legally permissible because it is impossible for him to ever pay it back.

17. The amount of loss imposed on the defendant was not foreseeable and the trial court failed to make specific findings regarding the scope of defendant's conduct.

18. The trial court failed to state in writing the reasons for its rulings on the defendant's objections to the PSI.

19. The trial court should have departed downward because the defendant was a minor participant and because he accepted responsibility for his actions.

20. The defendant was entitled to a jury trial in the contempt proceedings against him.

21. The trial court erred when it adjudicated the defendant guilty of criminal contempt.

22. The trial court should have granted the defendant's motion to be released pending appeal.

to/critique of counsel's performance, although a great number of his claims assail strategic decisions that are virtually unchallengeable.

## II. LEGAL ANALYSIS

A. <u>Section 2255 relief, generally</u>

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited.  A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law or (4) is otherwise subject to collateral attack.  28 U.S.C. § 2255; *United States v. Phillips*, 225 F.3d 1198, 1199 (11th Cir. 2000); *United States v. Walker*, 198 F.3d 811, 813 n.5 (11th Cir. 1999).  "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'"  *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted).  "[A] non-constitutional error that may justify reversal on direct appeal does not generally support a collateral attack on a final judgment, unless the error (1) could not have been raised on direct appeal and (2) would, if condoned, result in a complete miscarriage of justice."  *Lynn*, 365 F.3d at 1232-33 (citations omitted); *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962) (error of law does not provide basis for collateral attack unless claimed error constituted a "fundamental defect which inherently results in a complete miscarriage of justice.").  The "fundamental miscarriage of justice" exception recognized in *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2678, 2649, 91 L. Ed. 2d 397 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent. . . ."

Although section 2255 mandates that the court conduct an evidentiary hearing "unless the motion and files and records conclusively show that the prisoner is entitled to no relief," a defendant must support his allegations with at least a proffer of some credible supporting evidence.  *Ferguson v. United States,* 699 F.2d 1071, 1072 (11th Cir. 1983).

A hearing is not required on frivolous claims, conclusory allegations unsupported by specifics, or contentions that are wholly unsupported by the record. *Peoples v. Campbell*, 377 F.3d 1208, 1237 (11th Cir. 2004); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *Holmes v. United States*, 876 F.2d 1545, 1553 (11th Cir. 1989) (citations omitted). Likewise, affidavits that amount to nothing more than conclusory allegations do not warrant a hearing. *Lynn*, 365 F.3d at 1239.

B. *Booker* Claim

Defendant's first claim for relief is that he was denied his Fifth and Sixth Amendment rights under *Apprendi,*[3] *Blakely*[4] and *Booker.*[5]  He claims that his sentence was improperly enhanced and that the federal sentencing guidelines were erroneously applied as mandatory, rather than advisory.

In the seminal case of *Apprendi v. New Jersey*, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490, 120 S.Ct. at 2362-63.  *See also Ring v. Arizona*, 536 U.S. 584, 589, 122 S.Ct. 2428, 2432, 153 L.Ed.2d 556 (2002) (concluding under *Apprendi* that "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.").    Since *Apprendi* was decided, the Supreme Court has decided two additional cases that relate to federal sentencing, *Blakely v. Washington*, and *United States v. Booker,* upon both of which the defendant relies.

As clarified in *Blakely*:

the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict*

---

[3]  *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 2362-63, 147 L.Ed.2d 435 (2000).

[4]  *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

[5]  *United States v. Booker,* ___ U.S. ___, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

> *or admitted by the defendant.  See Ring, supra*, 536 U.S. at 602, 122 S.Ct.
> at 2428 ("'the maximum he would receive if punished according to the facts
> reflected in the jury verdict alone'" (*quoting Apprendi, supra*, 503 U.S. at 483,
> 120 S.Ct. at 2348)) . . . .  In other words, the relevant "statutory maximum"
> is not the maximum sentence a judge may impose after finding additional
> facts, but the maximum he may impose *without* any additional findings.

124 S.Ct. at 2537-38 (emphasis in original, some citations omitted); *see also In re Dean*,
375 F.3d 1287, 1290 (11th Cir. 2004) (quoting *Blakely*).

In *United States v. Booker,* 125 S.Ct. 738, 160 L.Ed.2d 621, 2005 WL 50108 (2005),
the Supreme Court extended its holding in *Blakely* to the Sentencing Guidelines, holding
that the mandatory nature of the federal guidelines rendered them incompatible with the
Sixth Amendment's guarantee to the right to a jury trial.  It excised two parts of the
Sentencing Reform Act to cure the constitutional defects: 18 U.S.C. § 3553(b)(1), which
made the guidelines result binding on the sentencing court and § 3742(e), which required
*de novo* review of sentences on appeal.  *Id.*  at 764.  This does not mean, however, that
*Booker* can be applied to cases in which the conviction is final, a fact which is crucial to the
court's consideration of the instant motion.  Both language within *Booker*, discussed *infra*,
and Supreme Court precedent indicate otherwise.

In *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) the
Supreme Court held that the Sixth Amendment's guarantee of the right to a jury trial
applied to the states.  In *DeStephano v. Woods*, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d
1308 (1968) the Court held that *Duncan* would not be given retroactive application - that
it applied only to those cases that were not final at the time it was decided, and that it did
not apply to cases on collateral attack.  The Court reasoned that the right to a jury trial was
fundamental to our system of justice, but that a trial without a jury would not necessarily
result in an inaccurate verdict.  Therefore, it would not be necessary to grant a new trial to
every person convicted without a jury.

In *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) the
Supreme Court held that only a jury, not a judge, could make findings on the aggravating
factors necessary to invoke the death penalty.  In *Schriro v. Summerlin*, 542 U.S. 348, 124

S.Ct. 2519, 159 L.Ed.2d 442 (2004) the Court held that *Ring* applied only to those cases that were not final at the time it was decided, and that it did not apply to cases on collateral attack.  The Court reasoned that the rule announced in *Ring* was a procedural rule, not a substantive one, because it did not define an element of a crime.  Rather, it determined the manner in which fact finding is done.  The *Schriro* Court relied on *DeStephano*, *supra*, noting that "[i]f . . . a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be."  124 S.Ct. at 2526.

This is instructive on the application of *Booker*.  The *Booker* Court expressly noted that its holding was to be applied retroactively to "all cases ... pending on direct review or not yet final."  *Booker,* 125 S.Ct. at 769 (citation omitted).   It did not announce that the new rule would apply retroactively for cases on collateral attack, such as this one.   This reasoning necessarily follows from *DeStephano* and *Schriro*.  In those cases the Court held that it was not impermissibly inaccurate to conduct a criminal trial entirely without a jury, or for a judge alone to find aggravating factors necessary to trigger a death sentence. Based on those holdings, it is difficult to conclude that a hearing in which a judge finds only aggravating factors that result in an increased sentence could be impermissibly inaccurate. See *Schriro,* 124 S.Ct. at 2526.

Moreover, the *Booker* Court cited prior precedent with approval, stating that "[T]he constitutional safeguards that figure in our analysis concern not the identity of the elements defining criminal liability but only the required procedures for finding the facts that determine the maximum permissible punishment."  *Booker,* 125 S.Ct. at 755 (citations omitted).  The significance of this is that unlike substantive rules, new rules of procedure generally are not retroactive.  *Schriro*, 542 U.S. 348, 124 S.Ct. at 2523, 2526 (2004) ("[I]t does not follow that, when a criminal defendant has had a full trial and one round of appeals in which the [prosecution] faithfully applied the Constitution as we understood it at the time, he may nevertheless continue to litigate his claims indefinitely in hopes that we will one day have a change of heart.").

Finally, neither *Booker* nor *Blakely* applies retroactively to cases on collateral review. *Varela v. United States*, 400 F.3d 864, 866-868 (11th Cir.), cert. denied, 2005 WL 2085299 (2005); see also *In re Anderson*, 396 F.3d 1336 (11th Cir. 2005) (holding that only the Supreme Court can make a new rule retroactive on collateral review, and that it must do so explicitly); *Bey v. United States*, 399 F.3d 1266, 1269 (10th Cir. 2005) ("Booker may not be applied retroactively to second or successive habeas petitions."); *Humphress v. United States*, 398 F.3d 855, 860 (6th Cir. 2005) ("[W]e conclude that Booker's rule does not apply retroactively in collateral proceedings...."); *Green v. United States*, 397 F.3d 101, 103 (2nd Cir. 2005) (per curiam) ("[N]either *Booker* nor *Blakely [v. Washington*, 542 U.S. ----, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004),] apply retroactively to Green's collateral challenge."); *McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir. 2005) ("*Booker* does not apply retroactively to criminal cases that became final before its release on January 12, 2005."); *Cirilo-Munoz v. United States,* 404 F.3d 527, 533 (1st Cir. 2005) (it is unlikely that the Supreme Court will adopt a retroactivity analysis that opens up to required reexamination practically all of the federal sentences imposed since the guidelines went into effect in 1987).  Since *Booker*'s effect on sentencing guidelines cases is not retroactive on collateral review, it is not applicable to this § 2255 motion, and defendant is not entitled to relief on this ground.

C.   Ineffective assistance of counsel

      1.   General Legal Standards

Ineffective assistance of counsel claims are generally not cognizable on direct appeal and are properly raised by a § 2255 motion regardless of whether they could have been brought on direct appeal.  *Massaro v. United States,* 538 U.S. 500, 503, 123 S.Ct. 1690, 1693, 155 L.Ed.2d 714 (2003); *see also United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002); *United States v. Jiminez*, 983 F.2d 1020, 1022, n. 1 (11th Cir. 1993). To show a violation of his constitutional right to counsel, defendant must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that he was prejudiced by this inadequacy.  *Strickland v. Washington*, 466 U.S. 668, 686,

104 S.Ct. 2052, 2064, 80 L.Ed.2d (1984); *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000).  In applying *Strickland*, the court may dispose of an ineffective assistance claim if defendant fails to carry his burden on either of the two prongs.  466 U.S. at 697, 104 S.Ct. at 2069.

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Id*. at 688, 104 S.Ct. at 2065; *see Atkins v. Singletary*, 965 F.2d 952 (11th Cir. 1992).  "[R]eviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Yordan v. Dugger*, 909 F.2d 474, 477 (11th Cir. 1990) (citing *Harich v. Dugger*, 844 F.2d 1464, 1469 (11th Cir. 1988); *Chandler v. United States,* 218 F.3d 1305, 1314 (11th Cir. 2000); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation")).  Counsel's performance must be evaluated with a high degree of deference and without the distorting effects of hindsight. *Strickland*,  466 U.S. at 689, 104 S.Ct. at 2065.  To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take."  *United State v. Freixas*, 332 F.3d 1314, 1319-1320 (11th Cir. 2003). (quoting *Brownlee v. Haley*, 306 F.3d 1043, 1059 (11th Cir. 2002)(quoting *Strickland*, 466 U.S. at 687, 689-90, 104 S.Ct. at 2064-66 and *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)).

With regard to the prejudice requirement, defendant must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.  For the court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Lockhart v. Fretwell*, 506 U.S. 364, 369-70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).  Defendant therefore must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart*, 506 U.S. at 369 (quoting *Strickland*, 466 U.S. at 687).

Or in the case of alleged sentencing errors, defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been less harsh due to a reduction in the defendant's offense level. *Glover v. United States*, 531 U.S. 198, 203-04, 121 S.Ct. 696, 700-01, 148 L.Ed.2d 604 (2001). A significant increase in sentence is not required to establish prejudice, as "any amount of actual jail time has Sixth Amendment significance." *Id.*

To establish ineffective assistance, defendant must provide factual support for his contentions regarding counsel's performance. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *Stano v. Dugger*, 901 F.2d 898, 899 (11th Cir. 1990) (citing *Blackledge*, 431 U.S. at 74, 97 S.Ct. at 1629).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail . . . are few and far between." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000). This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 122 S.Ct. 234 (2001).

Defendant's ineffective assistance of counsel claims will be considered against the backdrop of these legal standards.

2. Defendant's specific claims

As noted in counsel's affidavit, the essence of defendant's myriad complaints is that counsel was utterly unprepared for trial, a claim counsel states that he denies. (Doc. 1296, exh. 2 at ¶ 1). Counsel avers that any alleged inadequacies on his part were dwarfed by the overwhelming volume of evidence against his client. (Doc. 1296, exh. 2 at ¶ 1). As noted above, Mr. Quinnell was appointed to represent the defendant two months before trial when the previous counsel was unable to continue, after having represented the

defendant for over six months.  Mr. Quinnell's appointment as substitute counsel two months before trial and his attempt to seek a continuance were the subject of appellate discussion.  (Doc. 1184 at 32-33).  The Eleventh Circuit found that the district court had not abused its discretion in denying the motion for a continuance, in large part because of the length of time that had passed since the June 21, 2000 indictment and the March, 2001. Therefore, this was a tacit finding that counsel was provided adequate time to prepare, even if Matz believed otherwise.  "*Strickland's* approach toward investigation reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Grayson v. Thompson*, 257 F.3d 1194, 1221 (11th Cir. 2001).  And, every attorney is faced with zero-sum calculations on time, resources and defenses to pursue at trial.  *Turner v. Crosby*, 339 F.3d 1247, 1276 (11th Cir. 2003) (quoting *Chandler*, 218 F.3d at 1314 n. 14). As such, "[h]ow a lawyer spends his inherently limited time and resources is also entitled to great deference by the court."  *Grayson*, 257 F.3d at 1221 (quoting *Chandler*, 218 F.3d at 1318 n.22).  Thus, while hindsight may provide a different outlook, counsel's decisions at a given time as to how to spend the limited time he did have are not to be subjected to Monday-morning quarterbacking.

Counsel's experience should also be taken into account in examining his strategic decisions.  Mr. Quinnell notes in his affidavit that he had experience with several large fraud-type cases in federal court including a 6-month trial and two other cases in which the trials lasted 3 to 6 weeks, in addition to other fraud cases that did not go to trial.  (Doc. 1296, exh. 2 at ¶ 6).  And, "the more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense . . . was reasonable under the circumstances."  *Brown v. Jones*, 255 F.3d 1273, 1278 (ellipses in original) (quoting *Gates v. Zant*, 863 F.2d 1492, 1498 (11th Cir. 1989)).  Thus, the "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel."  *Brown*, 255 F.3d at 1277 (quoting *Chandler*, 218 F.3d at 1316 (quoting *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998))).  Counsel also noted that he has extensive experience in civil court regarding

financial issues in guardianship accountings, trust accountings, estate accountings, etc., as well as an LL.M. degree in taxation.

Claim 1 (B)--Failure to interview witnesses

Defendant's first ineffective assistance of counsel claim is that counsel was ineffective because he failed to interview and/or call as witnesses at trial twenty-seven individuals identified by the defendant in his motion.  Of these, the government identifies twelve individuals who testified for the government, all of whom it claims provided testimony damaging to the defendant.  Defendant also maintains that had counsel interviewed these witnesses, he would have been able to conduct more effective cross-examination.

In his affidavit, counsel notes that during his preparation he found the defendant's list of witnesses to be way too lengthy, or not helpful, and to include critical prosecution witnesses who were very damaging to the defense case. (Doc. 1296, exh. 2 at ¶ 21). Counsel also noted that in federal criminal practice, an area in which the defendant does not have experience, there are no depositions, and witnesses cannot be compelled to give information.  (*Id.* at ¶ 12).  Therefore, even an attempt at an interview could be fruitless. Counsel states that he asked the defendant exactly what he expected each witness would say to help the defense case, and afterwards made the judgment call that most of the witnesses would be unhelpful, if not hostile or otherwise damaging. (*Id.* at 21).  Counsel called three witnesses at trial.  He recalled government witnesses Gregg Skibbee and Betty Smith (doc. 484 at 26, 27), and called Jimmy Messick, C.P.A. (doc. 484 at 27). Counsel also participated in the direct examination of defense witnesses Milo Segner and Jack Higgins.  (Doc. 484 at 25).  Counsel states that he tried to speak with both Skibbee and Smith before their testimony, and was able to speak with Mr. Skibbee's attorney and with Mrs. Smith personally.[6]  (Doc. 1286, exh. 2 at ¶ 21).   He describes both of them as "pretty

---

[6]When beginning his direct examination of Ms. Smith at trial, however, counsel stated that he and the witness "[had] just been introduced, (doc. 882, Tr. Vol. XIX at 35), thus suggesting that they had not previously spoken.

wary and cautious," and notes that their testimony was "both good and bad."[7]  Counsel also indicated he had spoken with two other individuals whose testimony would have proven to be damaging, and hence he did not call them as witnesses.  (Doc. 1286, exh. 2 at ¶ 21).

Defendant also complains that counsel chose to call Jimmy Messick, a "school chum," as a witness at trial rather than forensic accountant Mr. Hekman, with whom defendant had personally spent many hours in preparation.  Counsel indicated in his affidavit that when he spoke with Hekman, the accountant indicated that he did not have

---

[7]Gregory Skibbee's testimony appears to have been focused on the introduction of documents. Skibbee testified about United Holdings and how the company became involved in high yield investments, including the investigations (due diligence) that were done before it decided to become involved with Hammersmith. (Doc. 872, Tr. XVIII at 232 et seq.)  He also testified that United Holdings conducted due diligence investigations on potential clients, and explained how this process worked, including how the clients and United Holdings got paid.  (*Id.* at 249-261).  Mr. Skibbee testified that defendant Matz was the attorney for United Holdings and explained how Matz was paid in accordance with a written fee agreement.  (*Id.* at 261-64).  Skibbee read aloud to the jury the contents of a letter he had asked the defendant to write, essentially vouching for the reliability of Bridgeport Alliance.  (*Id.* at 270-271).  He testified about a weeklong meeting that the principals of United Holdings had in Florida with Bridgeport and Hammersmith.  (*Id.* at 273-75).

Mr. Skibbee then testified about the inceptions and workings of United States Holdings, a separate entity, including the purchase of a bond to insure clients' investments.  (Doc. 872, Tr. XVIII at 275-282).  He testified that at some point there were difficulties in getting clients their earnings and that they began to ask questions.  (*Id.* at 285, 287-90, doc. 882, Tr. Vol. XIX at 7-16).  Skibbee testified that in October of 1998, United Holdings sent a letter to Bridgeport to resign as an agent to the company, because the clients weren't listening to them, presumably about perceived problems with the program.  (Doc. 882, Tr. Vol XIX at 13, 25). Defendant Matz was involved in the efforts to get the clients back some of their money.  (Doc. 882, Tr. Vol. XIX at 16-23).

During cross examination by the government, Mr. Skibbee testified that in October of November of 1998, Mr. Matz was still meeting with investors and putting them into the Hammersmith program outside of Skibbee's presence or knowledge. (Doc. 882, Tr. Vol. XIX at 32-33). The witness also testified that he had returned some investment overage on behalf of himself and Mr. Matz, approximately $25,000, for which Matz had not paid him back. (*Id.* at 33-34).  He admitted that none of United Holdings' clients had requested their principle back by the time of United's resignation as agent in October of 1998.  (*Id.* at 34).

Betty Smith testified about her involvement with United Holdings and placing investors in the Hammersmith investment program.  (Doc. 882, Tr. Vol. XIX at 36-41).  She identified clients and participants, noting that she did not get paid if there were no profits.  She explained that United States Holdings was formed with different owners than United Holdings, but with the purpose of bringing clients into Hammersmith.  (Doc. 882, Tr. Vol. XIX at 41-42).  She noted that earnings payments were delayed or stopped altogether near the end of August, or early September of 1998, and that efforts to collect money from Hammersmith did not go very well.  (*Id.* at 43).  She testified that among the members of United States Holdings, protecting the clients' principal was much more important than trying to get a profit.  (*Id.* at 44).  She also testified that she never thought she was participating in anything illegal at the time.  (*Id.*).

On cross examination, she stated that she and Gregory Skibbee had hired and relied upon the defendant Matz to be their attorney to examine the paperwork to make sure they were doing the right thing. (Doc. 882, Tr. Vol. XIX at 45).  They broke away from him in October of 1998 because they were unsure of what he was doing, were unfamiliar with the clients he was bringing in, and didn't like the way he was handling things at that point.  (*Id.*)

sufficient records to properly analyze Matz's bank statements, and that when counsel reviewed the work product of Hekman and his associate, it was not focused on the true issues at trial and was of no use to the defense.  (Doc. 1296, exh. 2, ¶ 17).  Therefore, it was a reasonable strategic decision not to call Hekman as a witness, particularly in light of the court-imposed limitation on the number of witnesses discussed below.

Finally, to the extent defendant claims that counsel should have called additional witnesses, he has failed to show prejudice.  At the conclusion of the hearing held on October 14, 2000 the court told then counsel that it found "the number of witnesses and what they propose to say to be somewhat intertwined and on occasion overlapping and some of them to be borderline worthwhile." (doc. 324 at 160).  The court then told counsel to "pick [his] best four and [the court would] authorize their coming."  (Doc. 324 at 161).  Therefore, defendant has failed to show that he would have been permitted to call any more than four witnesses, even had counsel attempted to do so.

Claim 2 (C)--Failure to request *Daubert* hearing

Defendant contends that counsel should have requested a *Daubert*[8] hearing on the expert testimony of Milo Segner, C.P.A.  He claims that Segner was testifying "according to instructions from the government" rather than expressing his own opinions, that Segner's accounting methods were not within "generally accepted accounting principles" and that his testimony created false impressions about the extent of the scheme which led to the "erroneous conclusion" that there was $20 million missing and unaccounted for."  He also suggests counsel could have used a *Daubert* hearing strategically to allow him to preview the other expert testimony that would be presented in the case.

In *Daubert*, the Court held that, when "[f]aced with a proffer of expert scientific testimony, ... the trial judge must determine ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592, 113 S.Ct. at 2796.   In making this determination the district

_____

[8]*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

court should consider factors such as whether the theory or technique can be and has been tested, whether it has been subjected to peer review and publication, the known or potential rate of error, and whether the theory is widely accepted in the relevant scientific community.  *Id.* at 593-595, 113 S.Ct. at 2796-2797. The Eleventh Circuit held in *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) that:

> [S]cientific expert testimony is admissible if '(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'

262 F.3d at 1234 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).  The principles of *Daubert* do not apply only to traditional "scientists" but also to accountants.  See *Craftsman Limousine, Inc. v. Ford Motor Company*, 363 F.3d 761, 770 (8th Cir. 2004); *JGR, Inc. v. Thomasville Furniture Industries, Inc.*, 370 F.3d 519 (6th Cir. 2004).

Mr. Segner was cross examined both at trial and at the July 6, 2001 loss hearing by counsel for defendant Matz, Matz himself, and other counsel, (see Doc. 877, Vol. XV at 113-192; Doc. 879 Vol. XVI 3-188; Doc. 853, Vol. XVII at 4-52; Doc. 739 at 96-187), all of whom had the opportunity to attempt to persuade the jury or the court of the unreliability of his accounting methods.  At the loss hearing, for instance, Matz, who was then representing himself, commented that Segner's accounting was "full of holes," that it was an inaccurate way of counting money, it was a "magical accounting system," that the "accounting presented at trial did not meet the test for believability," was a "continuing series of accounting errors," was "done in a fashion which renders it unreliable for purposes of trial, for purposes of sentencing or for any other purpose" and that it did not "have the ring of truth to it." (doc. 739 at 65, 76-77, 78, 82, 166).  With respect to the latter comments, the court noted that the witness had explained that his figures were updated every time additional information became available, such that defendant's challenge to changes in the information was "difficult to follow."  (Doc. 739 at 166-67, 168).  The court

apparently was not persuaded by any of the attempts to discredit Mr. Segner, and relied upon his testimony, at least to an extent, in sentencing and assessing restitution against the various defendants.  Defendant has not shown what other challenges to the testimony could or should have been made at a *Daubert* hearing and would have resulted in the exclusion of Segner's testimony.   Therefore, defendant has not shown that he was prejudiced by counsel's failure to request such a hearing, and he is not entitled to relief on this ground.

Claim 3 (D)--Failure to confer

Defendant claims that his attorney failed to meet and confer with other defense counsel in their daily meetings.  Because of this, counsel was not involved in preparing defense witnesses to testify (e.g., Higgins, Hansen and Cook), reviewing *Brady* materials, or preparing jury instructions.  Defendant states that he attended these meetings, but that counsel failed and refused to debrief him about what took place.   The government claims that this argument is refuted by counsel's affidavit, although counsel did not specifically address this claim.   Still defendant's claim fails on the issue of prejudice.  He does not specifically state what outcome-altering fact counsel missed out on by not attending the meeting.  He does not specifically state how he was prejudiced by counsel's failure to participate in the preparation of the other defense witnesses or how such preparation would have altered the outcome of this case.  In fact, he faults counsel for not "exploring" how he could use defense witnesses to Matz' advantage, a claim that falls far short of the mark of establishing prejudice.  As noted above, counsel is not expected to act as though he has endless time, energy or financial resources in investigating a case.  *Grayson*, 257 F.3d at 1221, *Chandler*, 218 F.3d 1318 n. 22.  Defendant's claim is further weakened by the fact that the defense counsel held a mock trial, after which his counsel concluded that distancing Matz from the other defendants was a viable strategy. (Doc. 1296, exh. 2 at ¶ 10).  Therefore, it cannot be said that counsel was unaware of what tactics or witnesses the other defense counsel intended to use.

Claim 4 (E)--Failure to debrief defendant[9]

Like many of the defendant's claims, this claim goes well beyond the scope addressed in the heading.  Defendant states that he and his predecessor counsel Reed Ammon had done nearly six months of intensive pre-trial preparation, culminating in the preparation of thirty-six[10] notebooks of organized and highlighted materials.  Although defendant offered these notebooks to counsel, along with his assistance, on January 21, 2001, he claims that counsel never availed himself of the offer, instead waiting until March 1, 2001, just before the trial began, to meet with him for the first time.

Again, the government maintains that this claim is refuted by counsel's affidavit.  Counsel states that he spent 114 hours on the defendant's case during the six weeks prior to trial. (Doc.1296, exh. 2 at ¶ 7).  Counsel notes that the defendant did not come to town until just before the trial, but that after that point they met most evenings to prepare for the next day of trial.   (Doc. 1296, exh. 2 at ¶ 16).  He states that his client was helpful in building a set of defendant's exhibits that were introduced into evidence through Mr. Skibbee, but that Matz was unable to properly digest all of the information and place it into trial context.  (*Id.*, at ¶ 16).  He also noted that his client was unable to help with analyzing his bank account transactions, which were key to the case.  (*Id.*, at ¶ 17).  Therefore, it appears that he did attempt to debrief his client in the limited time Matz was available and use the information that his client had, but Matz was misguided about what sorts of things would be helpful.

---

[9]This claim is closely intertwined with claim 14(o).

[10]The number of notebooks is variously identified as thirty-six or thirty-seven throughout defendant's pleadings.  The court adopts the number thirty-six for use in this recommendation.

Claim 5 (F)--Failure to request a Kastigar Hearing

_____Defendant claims that he was issued a "*Kastigar* letter" dated May 20, 1999 by

AUSA Reed Pixler of Phoenix Arizona, which provided him with immunity.[11]   The term

*Kastigar* letter derives from *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32

L.Ed.2d 212 (1972), wherein the Supreme Court stated that a government entity seeking

to prosecute a witness who has been immunized under the federal immunity statute, 18

U.S.C. §§ 6001-6003, has "the affirmative duty to prove that the evidence it proposes to

use is derived from a legitimate source wholly independent of the compelled testimony".

*Id.* at 460, 92 S.Ct. at 1665.  See also *Taylor v. United States*, 148 F.3d 1276, 1279 (11th

Cir. 1998).  "Testimony obtained pursuant to a grant of statutory use immunity may be used

neither directly nor derivatively."  *Braswell v. United States*, 487 U.S. 99, 119, 108 S.Ct.

2284, 2295 101 L.Ed.2d 98 (1988) (citing 18 U.S.C. § 6002; *Kastigar,* 406 U.S. 441, 92

S.Ct. 1653, 32 L.Ed.2d 212 (1972)).  A defendant who has been granted immunity and is

subsequently prosecuted may be entitled to a *Kastigar* hearing to determine whether his

constitutional rights are violated by the bringing of an information based on the testimony

given pursuant to the immunity agreement.  *Taylor*, 148 F.3d at 1279.  A defendant raising

a claim under the federal immunity statute "need only show that he testified under a grant

of immunity in order to shift to the government the heavy burden of proving that all of the

evidence it proposes to use was derived from legitimate independent sources."  *Braswell*,

487 U.S. at 119, 108 S.Ct. at 2295 (quoting *Kastigar*, 406 U.S. at 461-462, 92 S.Ct. at

1665).  The *Braswell* Court went on to state that "[e]ven in cases where the Government

---

[11]The letter provided in pertinent part:
1.  No statements made by or other information provided by you during discussions with the agents will be used against you.  This means that if you were to be prosecuted for any offense, even one that you revealed in the course of your cooperation with the investigation, what you said during that cooperation could not be introduced as evidence against you in the government's case-in-chief.
2.  The government may make derivative use of any may pursue any investigation leads suggested by any statements made by or other information provided by you or your attorney.  This provision is necessary in order to eliminate the necessity for a *Kastigar* [406 U.S. 441 (1972)] hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted by any statements made by or other information provided by the defendant or the defendant's attorney during the off-the-record proffer or discussion.
(Doc. 163, exh. A).  It was signed by the defendant and his then-attorney, and Reid C. Pixler of the United States Attorney's office in the District of Arizona.

*Case No: 3:00cr48/LAC; 3:05cv117/LAC/MD*

does not employ the immunized testimony for any purpose-- direct or derivative--against the witness, the Government's inability to meet the 'heavy burden' it bears may result in the preclusion of crucial evidence that was obtained legitimately." *Id.* 487 U.S. at 119, 108 S.Ct. at 2295.

In this case, defendant contends that counsel failed to read the alleged *Kastigar* letter, review any court proceedings related to the letter, failed to investigate the facts and circumstances surrounding the issuance of the letter, or in short, took virtually no steps to protect him pursuant to the provisions of that letter.

The government contends that this issue was "fully litigated prior to trial." (Citing doc. 163 & 272). The record reflects that the defendant, through his former counsel Reed Ammon, moved to dismiss the indictment (doc. 163), and that the court held a hearing, and denied the defendant's motion. (Docs. 272, 324). The appellate court found that the district court did not err in its decision. (Doc. 1184 at 34). In his reply, the defendant states that contrary to the government's suggestion, the issue was not "fully litigated" prior to trial. He maintains that the only issue that had been partially litigated was whether the letter in question provided total immunity from prosecution, but the government was never put to the"heavy burden of proof" required by *Kastigar*.

In his motion to dismiss the indictment, defendant argued that any and all evidence obtained from him since September of 1998, along with any evidence that is the "fruit" of such information must be suppressed in his prosecution, and that the indictment had to be dismissed with prejudice because it was the result of a "betrayal of immunity agreements" Matz entered into with both the United States and the state of Arizona. (Doc. 163 at 2, 25-29). He also clarified that he was not arguing that he could not be prosecuted, but that he could only be prosecuted with evidence that the government established had an independent legitimate source and was thus "untainted." (Doc. 163 at 23). Because, defendant maintained, the evidence used to prosecute this case originated solely from Matz himself, the indictment must be dismissed with prejudice, or in the alternative, he requested a pre-trial *Kastigar* hearing. (*Id.* at 23-24).

The court held a hearing on October 14, 2000 at which it heard argument on this issue.  (Doc. 324 at 138-157).  The court indicated that it accepted the government's representation about what it was and was not going to use as evidence during its case in chief, and also referenced the paragraph of the purported immunity letter which specifically noted that the government could make derivative use of or pursue any investigation leads suggested by any statements made by or other information provided by the defendant.  (Doc. 324 at 140-146).  His motion was denied without prejudice because he had not shown a single item that was going to be used against him as a result of his cooperation and in violation of the "immunity letter."   (Doc. 324 at 154, 157).  The court noted that items seized pursuant to a search warrant could not be considered voluntary cooperation, and hence were presumably permissible for use by the government.  (Doc. 324 at 145).

Even if defendant's successor counsel Mr. Quinnell had again requested a *Kastigar* hearing, based on the court's ruling and findings in the first hearing, defendant has failed to show that such a hearing would have been granted, or that the outcome of proceedings would have been any different.  As noted above, the district court's denial of the motion to dismiss was upheld on appeal.  Therefore, he is not entitled to relief on this ground.

Claim 6 (G)--Failure to appeal denial of *Faretta* motion

Defendant contends that counsel was ineffective because he failed to file an interlocutory appeal of the court's denial of his *Faretta*[12] motion.  He states that he asked counsel to file this appeal upon leaving the *Faretta* hearing on March 1, 2001, and that counsel responded he would "think about it."  He maintains that counsel told him he now had a "free ride" and a "built-in insurance policy" in that the reversal of the lower court was virtually assured in the event of an appeal.

Defendant argues that counsel should have appealed under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).   In *Cohen*, the Supreme Court found that it is appropriate to take an

---

[12]*Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

interlocutory appeal of decisions by the district court that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." 337 U.S. at 546, 69 S.Ct. at 1225-1226. Otherwise, by waiting until the case is adjudicated, it could be too late effectively to review the orders and the rights conferred could have been lost, possibly irreparably. Defendant argues, citing *Reshard v. Britt*, 819 F.2d 1573 (11th Cir. 1987) that this reasoning is applicable to this case. *Reshard v. Britt*, 819 F.2d 1573, 1581 (11th Cir. 1987) ("[W]e believe that an order granting a motion disqualifying a party from proceeding pro se, cannot be 'effectively reviewed on appeal' after final judgment, and therefore, should be immediately reviewable as a collateral order, under the *Cohen* doctrine."), rehearing granted and opinion vacated *Reshard v. Britt*, 831 F.2d 222 (11th Cir. 1987) and on rehearing *Reshard v. Britt*, 839 F.2d 1499 (11th Cir. 1988). *Reshard*, however dealt with a civil case and a party's right to proceed pro se under 28 U.S.C. § 1654, rather than a criminal matter.

In the case at bar, defendant challenged on direct appeal the district court's denial of his motion to proceed pro se. The appellate court found that there was no error because defendant's waiver of his right to counsel was not unequivocal. (Doc. 1184 at 32). Defendant makes the conclusory assertion that he could not "effectively" appeal the adverse decision after final judgment, but he does not explain how or why he believes the outcome of the appeal would have been different had it been taken immediately after the district court denied his motion. Therefore, he was not prejudiced and he is not entitled to relief.

Claim 7 (H)--Failure to review any evidence

Defendant claims that Quinnell failed to review any of the 270,000 pages of documentary evidence at the government repository. However, defendant also represents that he and his predecessor counsel reviewed all the documents and put the relevant ones into a thirty-six volume file of binders. It would appear that the defendant's preparation

would have obviated the need for counsel to "reinvent the wheel" and go through the documents again, particularly given time constraints.  However, defendant contends that counsel also failed to review the contents of these binders, with limited exceptions.[13]  As a result of this, he claims that Mr. Quinnell could not develop a theory of defense, failed to investigate the defense that defendant was urging, and was unable to effectively cross examine testifying witnesses.

Counsel concedes in his affidavit that even if he had had every minute of every work day to prepare for the trial, he could not have read and properly understood all of the documents.  (Doc. 1296, exh. 2).  He states that because there was a mountain of documentary evidence in gross form with limited available time prior to trial, he had to figure out the prosecution's "big picture," and to focus and prioritize preparation efforts.  Counsel cannot be said to have disregarded his obligation to the defendant.  He states in his affidavit that in order to prepare for the defendant's trial, he delegated as much of his civil work as possible, rescheduled appointments and obtained extensions, and with respect to his coaching duties, he delegated responsibilities or simply missed practices.  Counsel indicates that he figured out and isolated the key financial transactions himself to "rein in the prosecution's broad statements about Mr. Matz" and show that his handling of his clients' money was proper, and introduced a counter spreadsheet through an experienced local CPA, Jimmy Messick.  (Doc. 1296, exh. 2 at ¶ 18).  This appears to be reasonable in light of the situation facing counsel.  And, as noted above, deference is afforded to the decisions of experienced trial counsel.  *Brown*, 255 F.3d at 1278; *Gates*, 863 F.2d at 1498.  Finally, Matz has not specifically identified any critical piece of evidence that counsel did not review and that could have changed the outcome of the case.

Claim 8 (I)--Failure to do any legal research

Defendant claims that counsel "never opened a law book" with respect to his case. He claims that counsel failed to do legal research on a variety of issues, the overwhelming

---

[13]The documents defendant identifies that Quinnell did review were documents pertaining to Skibbee and Endorsement #3, as it pertained to Barrett's testimony.

majority of which are raised and discussed elsewhere in his motion. One claim which is not discussed elsewhere is defendant's claim that counsel failed to do legal research on the law of conspiracy and therefore misstated the law on conspiracy in his closing argument. Even if this is true, the court instructed the jury that any statements made by counsel were not the law and that the jury was to follow the law as instructed by the court. (Doc. 485 at 4). The jury is presumed to have followed the judge's instructions. *United States v. Calderon*, 127 F.3d 1314, 1334 (11th Cir. 1997); *United States v. Wilson,* 149 F.3d 1298, 1302 (11th Cir. 1998); *United States v. Chandler,* 996 F.2d 1073, 1088 (11th Cir. 1993); *Raulerson v. Wainwright,* 753 F.2d 869, 876 (11th Cir. 1985). The jury instructions included a proper definition of conspiracy (doc. 485 at 10-12), and therefore under controlling law, defendant has not shown prejudice resulting from counsel's alleged misstatement of the law on conspiracy.

Defendant also claims that counsel did not understand basic procedural or evidentiary rules, such as the rule on hearsay. (Doc. 852 at 270-271). While it is true that counsel conceded in open court that he had "never understood" hearsay and that he needed "to learn these rules better," (doc. 852 at 270, 271), defendant's general allegations of resulting prejudice appear unsupported. Defendant contends that counsel's failure to understand Rule 807 of the Federal Rules of Evidence[14] and its applicability to hearsay statements of "such witnesses as Gibson, Hamilton, Miller, Stoner, Boeger, [and] Gibson's alleged advertisement" resulted in prejudice to him when the government's failure

---

[14]This rule provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed.R.Evid. 807.

to comply with the rule went uncorrected.  He provides no specific examples of this, much less any indication that the outcome of the proceedings were affected by counsel's alleged failing.  His conclusory assertion does not entitle him to relief.

Claim 9 (J)--Failure to pursue motion to suppress

Defendant states that his former attorney had filed a motion to suppress evidence gathered during a search of defendant's law office on January 23, 1999.  (Doc. 204).  At defendant's request, Quinnell brought the motion to the court's attention at the March 1, 2001 hearing, but after the court asked counsel to hold the motion until the witness Mark Knops arrived to testify at trial, (doc. 852 at 52-56), counsel never brought it up again.  As a result, defendant contends, evidence that should have been suppressed, including the Rancho Investor's account, the Leland letter, the Krota testimony and the Wok testimony was used against him because the scope of the search exceeded the warrant.

When defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, in order to demonstrate actual prejudice, the defendant must prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence.  *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S.Ct. 2574, 2582-83, 91 L.Ed.2d 305 (1986).  Regardless of whether a defendant's guilt is established by the excludable evidence, in the Eleventh Circuit the proper question is whether the outcome of the proceedings would have been different had the motion to suppress been filed and the evidence been excluded.  *Jones v. United States*, 224 F.3d 1251, 1259 (11th Cir. 2000); *Huynh v. King*, 95 F.3d 1052, 1058-59 (11th Cir. 1996); *Thomas v. Newsome*, 821 F.2d 1550, 1552 (11th Cir. 1987).

However, in defendant's "points and authorities" he states that:

"We are not here to discuss the final outcome of the Motion to Suppress. We are here to discuss SQ's ineffectiveness.  Matz was entitled to SQ's considered opinion after carefully considering the law and the facts.  SQ never looked at the issue."

(Doc. 1293 at 20).  This evidences a misunderstanding about what is required to show ineffective assistance of counsel. If a defendant cannot show that he was prejudiced by counsel's alleged failure, he is not entitled to relief.  Defendant has not shown that the Motion to Suppress would have been granted and the outcome of the proceedings would have been different, hence he is not entitled to relief on this claim.  Furthermore, the Eleventh Circuit upheld the denial of defendant's motion to suppress (doc. 1184 at 29-30) and rejected defendant's claim that he had not received a fair trial as a result.  (Doc. 1184 at 31).

Claim 10 (K)--Failure to obtain the Ammon file

Defendant claims that Mr. Quinnell was ineffective because he failed to obtain a complete copy of the file of his predecessor counsel, Reed Ammon.  Defendant notes that Quinnell wrote to Mr. Ammon only after the trial was over to get Ammon's file, and that those portions of the file that had been delivered previously were unread.  Defendant contends that because of this failing, counsel was unable to pursue issues that had already been "worked up" including *Kastigar* hearing, a *Jones* hearing, a *Daubert* hearing, and the motion to suppress, all of which have been discussed herein.  Defendant does not specifically state how the contents of former counsel's file would have assisted Mr. Quinnell or made those losing issues "winners." Therefore, even if what he says is true,[15] he has not shown prejudice, and he is not entitled to relief on this claim.

Claim 11 (L)--Failure to Debrief Ammon

Defendant next claims that Quinnell's failures were magnified by the fact that he did not debrief defendant's former counsel, Mr. Ammon about the eight months of work Ammon had done on defendant's case.  The government states that this claim is refuted by counsel's affidavit, although defense counsel does not explain or even mention his actions with respect to former counsel in his affidavit.  Still, defendant has failed to explain

---

[15]Counsel states in his affidavit that part of the 114 hours he logged in pre-trial preparation was obtaining and reviewing former counsel's files.  (Doc. 1296, exh. 2 at ¶ 7).

exactly what defense counsel would have learned had he "debriefed" Matz' former counsel that he could not learn from either the documentary evidence and records or his client himself that would have changed the outcome of the case.

Claim 12 (M)--Failure to Obtain or Review *Brady*[16] Material.

Defendant purports to complain that counsel did not review the six boxes of evidentiary material made available to defense counsel at the office of co-defendant's counsel Barry Beroset.  However, defendant states that he personally reviewed the materials, and, finding many items to be missing, he included copies of the missing items from his personal records in the 36 volume notebook of trial materials he prepared. Because the defendant summarized the items, he does not explain what prejudice inured to him by counsel's failure to personally go through the items, particularly in light of the short amount of time counsel had to prepare.  Furthermore, he specifically states that "the missing items would have been particularly valuable in cross-examining the respective witnesses" (doc. 1238 at 15), a statement which does not prove he was prejudiced by counsel's failure to look at the boxes of documents from which these items were "missing."

The defendant's reference to *Brady* material is not clear.  In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963), the Supreme Court held that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. It is no longer imperative that there be a request for the production of such evidence.  *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490  (1995); *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976);  *see also United States v. Scheer*, 168 F.3d 445, 451 (11th Cir. 1999)(material favorable, exculpatory or impeachment evidence must be produced regardless of request).  A successful *Brady* violation claim requires a showing that: (1) the prosecution possessed evidence favorable to the accused

---

[16]*Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963).

(including impeachment evidence); (2) the defendant did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceedings would have been different.  *United States v. Schlei*, 122 F.3d 944, 989 (11th Cir. 1997) (citing *United States v. Newton*, 44 F.3d 913, 198 (11th Cir. 1995)), *cert. denied,* 523 U.S. 1077, 118 S.Ct. 1523, 140 L.Ed.2d 674 (1998).  A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."  *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)); *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); *United States v. Scheer*, 168 F.3d 445, 451-52 (11th Cir. 1999).  In this case, defendant has not suggested that the prosecution withheld any favorable evidence, rather, he makes a more vague statement that certain items were "missing."  And, because defendant admits he was able to procure the missing items, there was no *Brady* violation for counsel to challenge.

Claim 13 (N)--Failure to Explore *Giglio* issue

Defendant contends that counsel failed to request *Giglio*[17] information from the government.  According to the defendant, this, coupled with counsel's failure to prepare, meant that the jury was not apprised of what he claims was a tacit agreement made by Gregory Skibbee, Paul Fischer and Betty Smith with David Newman, David Adams, Mark Knopfs and Agent Lambert, wherein defendant was made the "fall guy" in exchange for Skibbee, Fischer and Smith avoiding prosecution.

 In *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court found that the government's failure to disclose to the defense a promise to a key witness that he would not be prosecuted if he testified for the government required reversal of the defendant's conviction.  In that case, a promise made by one

---

[17]*Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Assistant United States Attorney was imputed to the entire office.  Additionally, the government's knowing reliance on perjured testimony is a violation of *Giglio.  United States v. Curtis*, 380 F.3d 1311, 1314 (11th Cir. 2004).  "In order to succeed on a Giglio challenge, the defendant must demonstrate that the prosecutor 'knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material.'" *United States v. Vallejo,* 297 F.3d 1154, 1163-64 (11th Cir. 2002) (quoting *United States v. Dickerson*, 248 F.3d 1036, 1041 (11th Cir. 2001), *cert. denied*, 536 U.S. 957, 122 S.Ct. 2659, 153 L.Ed.2d 835 (2001) (quotations omitted)).

In this case, defendant claims only that there was an agreement, albeit tacit, that if Skibbee, Fischer and Smith testified for the government they would not be prosecuted. He as much as concedes that Skibbee's agreement "was not formalized" and instead suggests that perhaps it was "evidence of bias."  The government states that Mr. Skibbee testified at trial both for the government and for the defendant, and that "during [his testimony] the issues of bias, immunity and promises were well covered."  (Doc. 565, Tr. Vol. V at 106 et seq., doc. 872, Tr. Vol. XVIII at 232 et seq.).  The court's review of the nearly 200 pages of testimony covered by the government's citation reveals that Skibbee testified at length about the substance of the alleged conspiracy but that the issues of immunity and promises were not well covered, if they were covered at all.  Although defendant claims in his reply that Skibbee told him in the spring of 1999 that Skibbee had worked out an agreement with the government, he offers no proof of this.  The government represents that "there were no immunity deals with any of the defendant's partners." Defendant has made no allegation, much less a showing, that any of the witnesses gave false testimony.  Thus, he has failed to establish even a prima facie case under Giglio. *LeCroy v. Secretary, Florida Department of Corrections*, 421 F.3d 1237, 1255 (11th Cir. 2005); *Tompkins v. Moore*, 193 F.3d 1327, 1339 (11th Cir. 1999).  If there were no agreements, there was nothing for the government to reveal, and counsel's alleged failure to ask for this information could not have resulted in prejudice.

    Claim 14 (O)--Failure to learn Matz' 37 (sic) volume file[18]

       Defendant contends that counsel failed to "learn" the 37 (sic) volume file that he had
prepared in conjunction with former counsel.  Defendant states that he and Reed Ammon
had spent eight months going through the government repository and defendant's own
files, interviewing witnesses, analyzing law, strategizing and otherwise preparing for trial.
Defendant explains that the product of this preparation was contained in a thirty-six volume
set of notebooks, indexed, outlined and organized, complete with highlighting and notes
about how to best utilize each document.  Matz complains that counsel refused to "learn"
the contents of these notebooks due to lack of time, because of his Elder Law certification
examination which took place during the early part of the trial, family commitments, his
private practice, and other reasons.

       Counsel did not address the trial notebooks and any review he may have done of
their contents in his affidavit.  However, he did explain in his affidavit the trial preparation
that he undertook.  Counsel does not enjoy the benefit of unlimited time and resources,
and every counsel is faced with zero-sum calculations on time, resources and defenses
to pursue at trial.  *Turner v. Crosby*, 339 F.3d 1247, 1276 (11th Cir. 2003) (quoting
*Chandler*, 218 F.3d at 1314 n. 14).  As such, "[h]ow a lawyer spends his inherently limited
time and resources is also entitled o great deference by the court."  *Grayson*, 257 F.3d at
1221 (quoting *Chandler*, 218 F.3d at 1318 n.22).  Because the test is not what the best
lawyer would have done, but rather what some reasonable lawyer would have done under
the circumstances, *Williamson*, 221 F.3d at 1180, the defendant has failed to show he is
entitled to relief.


    Claim 15 (P)-- Failure to develop a theme or theory of defense

       Defendant contends that counsel failed to build his client's defense around good
faith reliance on advice of counsel ("GFRAC"), as Matz requested.  He claims that counsel
failed to develop *any* discernable theory of defense.

_____

       [18]This claim is closely intertwined with claim 4(e).

Counsel states in his affidavit that he believed early on that the best tactic was to distance his client from Hammersmith's management and to show that he relied in good faith upon the representations of the other defendants about the investment program when becoming involved as an "outside salesman" or "outside broker."  (Doc. 1296, exh. 2 at ¶ 10).  He noted the difficulty in doing this because of the "clearly fraudulent" nature of the Hammersmith program, and his client's solicitation of investors both personally and in writing, even after he had been told that the program was fraudulent, and overwhelming volume of evidence against his client.  (Doc. 1296, exh. 2 at ¶¶ 9, 24).  The defendant's alleged good faith in becoming involved in the scheme was the clear theme in counsel's opening statement.  (Doc. 562, tr. Vol. II at 3-11).  Counsel buttressed this position by noting that the defendant only made money if the investors made a profit, and explained that the defendant had obtained a fidelity bond in an attempt to protect his clients' investments.  In his closing argument, counsel continued to advance the position that the circumstances did not show that the defendant knew that anything was amiss in the investment scheme.  (Doc. 836, Tr. Vol. XXIII at 65-86).

Counsel's tactical decisions on which defense to pursue are "virtually unchallengeable." *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (quoting *Strickland; Waters v. Thomas,* 46 F.3d 1506, 1522 (11th Cir. 1995)); cf *Miller v. Anderson*, 255 F.3d 455, 458 (7th Cir. 2001) (the fact that something was a tactical decision does not immunize it from review under *Strickland*).  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (quotation marks and citation omitted); see also Waters v. Thomas, 46 F.3d 1506, 1518-19 (11th Cir. 1995) (en banc) (observing that "[w]e cannot, and will not, second guess" the "strategic decisions trial counsel are called upon to make"). "[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy." *Johnson v. Alabama,* 256 F.3d 1156, 1176 (11th Cir. 2001).  The fact that defendant would have preferred that

counsel take a different strategic tactic, or that the tactic counsel chose was ultimately unsuccessful is not tantamount to saying counsel was constitutionally ineffective. After all, "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; accord, e.g., *Waters v. Thomas*, 46 F.3d at 1522 ("Three different defense attorneys might have defended Waters three different ways, and all of them might have defended him differently from the way the members of this Court would have, but it does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance."). Counsel indicates in his affidavit that his strategy was tested through a mock trial conducted by the defendants. (Doc. 1296, exh. 2 at ¶10). Under the circumstances of this case, the court cannot say that counsel's choice of defense strategy was unreasonable or constitutionally ineffective.

Claim 16 (Q)--Failure to participate in, evaluate, research or prepare jury instructions

Defendant claims that counsel failed to participate in "any manner or fashion" in the preparation of the jury instructions, and as a result there were no instructions on GFRACD, no special instructions were proposed or given about evidence that had been admitted for limited purposes, or as to evidence that was admitted against other defendants, but not against him.

Counsel did not refute defendant's allegation of his non-participation in the preparation of jury instructions in his affidavit. In its response, the government takes the position that appropriate limiting instructions were given throughout the trial and that the defendant did not have a legitimate GFRACD. In fact, the government notes that defendant held himself out to his victims in writing to be an expert in these types of investment programs.[19] To the extent defendant sought specific instructions as relating to the facts of his case, a review of the jury instructions reveals that no defendant had this

---

[19]The government cites "GX Phoenix 1, 6, 16, 33" as examples.

distinction. The defendants were mentioned by name only within the scope of the indictment, not with respect to particularized instructions.   Finally, there were instructions relating to both good faith and good faith reliance on advice of counsel.  (Doc. 48 at 23-24).[20]  The instructions given were in accordance with the evidence, but otherwise did not specifically state to which defendant they referred. Therefore, had the jury believed GFRACD was a viable defense for defendant Matz, it would have been a "complete defense to the charges in the indictment." (Doc. 485 at 23).  Defendant has not identified any other specific jury instruction that counsel should have requested, for which such a request would have been granted, and which would have made a difference in the outcome of his case.  His claim that the trial court erred by failing to instruct the jury on the lesser included offense of misprision of a felony was rejected on appeal.  (Doc. 1184 at 39-40).  And he has not explained how he was prejudiced because of counsel's failure to

_____

[20]The instructions read as follows:

Good faith is a complete defense to the charges in the indictment since good faith on the part of the Defendant is inconsistent with intent to defraud or willfulness which is an essential part of the charges.  The burden of proof is not on the Defendant to prove good faith, of course, since the Defendant has no burden to prove anything.  The Government must establish beyond a reasonable doubt that the Defendant acted with specific intent to defraud, as charged in the indictment.

One who expresses an honestly held opinion, or an honestly formed belief, is not chargeable with fraudulent intent even thought the opinion is erroneous or the belief is mistaken; and, similarly, evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent.

On the other hand, an honest belief on the part of the Defendant that a particular business venture was sound and would ultimately succeed would not, in and of itself, constitute "good faith" as that term is used in these instructions if, in carrying out that venture, the Defendant knowingly made false or fraudulent representations to others with the specific intent to deceive them.

Evidence has been presented that some Defendants may have relied on advice of counsel. This is another way to demonstrate good faith, and a Defendant would not be "willfully" doing wrong if, before taking any action with regard to the alleged offense, the Defendant consulted in good faith an attorney whom the Defendant considered competent, made a full and accurate report tot hat attorney of all material facts of which the Defendant had the means of knowledge, and then acted strictly in accordance with the advice given by that attorney.

Whether the Defendant acted in good faith for the purpose of seeking advice concerning questions about which the Defendant was in doubt, and whether the Defendant made a full and complete report to the attorney, and whether the Defendant acted strictly in accordance with the advice received, are all questions for you to determine.

(Doc. 485 at 23-24).

participate in the preparation of the proposed jury instructions.  Therefore, he has not shown ineffective assistance of counsel with respect to this claim and he is not entitled to relief.

Claim 17 (R)--Failure to request a *James* hearing

Defendant claims that counsel was constitutionally ineffective when he failed to request a *James*[21] hearing.  As a result, he claims, "highly prejudicial and unreliable hearsay" was admitted against him without contest.  By way of examples he cites "Skibbee's quotes from David Gibson, St. Jean's quotes from David Gibson, unidentified "inflight magazines", unidentified contract documents, various references to alleged statements and conduct of Scott Hamilton, etc."  (doc. 1263 at 23).  He also identifies generally "uncontested hearsay statements from witnesses such as Hamilton, Gibson, St. Jean, Skibbee, Miller, Stoner, etc." (doc. 1264 at 21).

The purpose of a *James* hearing is to determine whether the statements of a defendant's alleged coconspirators are admissible against him. See *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc); Fed.R.Evid. 801(d)(2)(E).  The *James* court held that co-conspirators' statements are admissible under the hearsay exception in Rule 801(d)(2)(E), which governs admissibility of coconspirator statements made during the course and in furtherance of the conspiracy, only if substantial independent evidence of a conspiracy exists.  *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001) (citing *James*, 590 F.2d at 581).  A so-called *James* hearing, conducted outside the presence of the jury, is one potential method for the district court to ensure the government can satisfy the predicate facts needed to prove the conspiracy independent of the statements. *Williams*, 264 F.3d at 576 (citing *United States v. Fragoso*, 978 F.2d 896,900 (5th Cir. 1992); *United States v. Alvarez*, 696 F.2d 1307, 1310 (1983).  Whether a hearing is necessary is within the discretion of the trial court.  *Williams*, 264 F.3d at 576 (citing *United*

---

[21]*United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc).

*States v. Fragoso*, 978 F.2d 896,900 (5th Cir. 1992).  The Eleventh Circuit had this to say about the parameters of the hearing.

> If, after the hearing, the judge is satisfied that there is substantial independent evidence that (1) a conspiracy existed, (2) that the coconspirator and the defendant against whom the statement is to be offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy, then he may allow into evidence the statements of the coconspirator.  As an additional measure of protection, the trial judge, on appropriate motion at the conclusion of all the evidence, must determine as a factual matter whether the prosecution has established the three facts listed above by a preponderance of the evidence. If the prosecution has failed to link the coconspirator's statements to proof of a conspiracy, the judge must determine whether a curative instruction to the jury to disregard the coconspirator's statements will correct the default or whether a mistrial is mandated.

*Alvarez*, 696 F.2d at 1310 (citing *James*, 590 F.2d at 582-83).

Through his arguments in this case, defendant appears to lose sight of the fact that the criteria for admission under *James* of otherwise unreliable hearsay statements is merely that substantial independent evidence of a conspiracy exists.  *Bourjaily v. United States*, 483 U.S. 171, 177, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987) (citing *United States v. Nixon*, 418 U.S. 683, 701 and n.14, 94 S.Ct. 3090, 3104 and n. 14, 41 L.Ed.2d 1039 (1974)).  The purpose of a *James* hearing is not to determine the underlying veracity or reliability of the hearsay statements.  Thus, defendant has not shown that he was prejudiced by counsel's failure to ask for such a hearing.

<u>Claim 18 (S)--Failure to ensure compliance with Local Rules on Discovery</u>

Defendant claims that counsel failed to avail himself of the Northern District of Florida Local Rule 26.3 regarding discovery in criminal cases.  He maintains that counsel initiated no formal requests for discovery, never received any written responses to discovery, and did not avail himself of the discovery that had been produced.[22]  He also

---

[22]As examples, defendant states that counsel never looked at Segner's CD, never visited the government repository, never visited the office of co-defendant's counsel, Mr. Beroset, to review the six boxes of discovery materials that had been produced by the government, did not interview any witnesses or conduct

claims that counsel failed to procure audiotapes of defendant's debriefings in Arizona, although defendant had advised counsel that these were still in existence and in the possession of the Arizona State authorities.  Finally, he contends that counsel did not receive a written summary of the testimony expected to be given by its experts or do anything to prepare for the experts.

In response, the government states that it fully complied with its discovery obligations, including provision of summaries of the testimony of its experts, Roger Cox and Milo Segner.  The government does not mention the audiotapes of the defendants' debriefings, but clearly if these were in the possession of the Arizona law enforcement, the United States could not be faulted for its failure to produce something it did not have. Defendant states in his reply that the only thing the government provided was a CD-ROM containing nothing but a listing of nearly 250,000 bank entries, covering more than 100 bank accounts, from which there was no way to glean the proposed testimony of Segner. The defendant does not specifically identify any document or testimony that was offered at trial but not disclosed pretrial which caused him prejudice.

<u>Claim 19 (T)–Failure to call an expert on attorney/client trust accounts</u>

Defendant's last claim is that counsel failed to call an expert on attorney client trust accounts who could have explained how such trust accounts operate, particularly in personal injury practice, specifically that most of the money that passes through these accounts does not belong to the attorney.  Defendant claims that the jury never understood that fact, nor did they know that one investment account, the Rancho Investor account, was segregated, requiring the investor's signature for any movement or withdrawal of funds. He also claims that the jury was left with the false impression that he had pilfered $14 million from a multitude of people over a period of years.  Defendant states that Mr. Hekman was prepared on the subject and could have given such testimony, but this witness was "abandoned" by counsel and no comparable witness called in his place.

---

any investigation.

*Case No: 3:00cr48/LAC; 3:05cv117/LAC/MD*

Counsel does not address this claim in his affidavit except to explain why Mr. Hekman was not going to be a useful defense witness.  The government argues that the trust account issue was completely irrelevant to the defendant's guilt in participating in the Ponzi scheme.  It further states that the defendant's new assertions of legitimacy of the "Rancho" account are completely unsupported by the voluminous bank records and analyses offered into the record.  Furthermore, even if one investment account was legitimate, this does not establish the defendant's innocence of the charges against him. Therefore, he has not shown prejudice in counsel's failure to introduce an expert on this issue.

Based on the foregoing, it is respectfully RECOMMENDED:

The motion to vacate, set aside, or correct sentence (doc. 1237)  be DENIED.

At Pensacola, Florida, this 28th day of November, 2005.


/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy thereof.  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings. <u>See</u> 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).